The next case is 25-1210, Merck Serono v. Hopewell Pharma Ventures. Mr. Fleming, when you're ready. Good morning, and may it please the Court, Mark Fleming from WilmerHale, together with Jennifer Graber and Gary Fox on behalf of Merck Serono. The Merck Serono inventors came up with a dosing regimen for multiple sclerosis different from anything the field had done. No reference alone or in combination. Disclosed treatment with these amounts of cladribine in an induction dose, followed by nothing for eight to ten months, and then the claimed maintenance dose. And the record is clear that the IVACS scientists, Drs. Bodor and Dandeker, didn't invent any dosing regimen at all. They swore under oath that they didn't. They disclosed part of the Serono inventors' method, but only part of it, in their own patent application. But they didn't claim it because they derived it from the Serono inventors. The Board, nonetheless, treated their disclosure as prior art, and that's legal error for a number of reasons, and if you agree with that, you can reverse without addressing anything else in these appeals. But the Board separately erred in finding a motivation to combine and reasonable expectation of success. The most the Board could say was that the claimed regimen, and specifically the claimed maintenance dose and interval, were logical, or in Hopewell's words, feasible. But not that a skilled artisan would be motivated to pursue it or reasonably expect success in doing so. Indeed, the ARC discouraged the claimed method precisely because of concerns about cladribine's ineffectiveness and toxicity. Nothing pointed a skilled artisan to the claimed regimen other than hindsight. So I'd like to address those two points. If time allows, I'd also address claim construction. First the Board— I have a case to support your argument that Bodor's—is that how you pronounce it? Bodor, yeah. Yeah. Bodor's dosing regimen is not a disclosure by another. I would start with Applied Materials, where this Court said, and I'll quote it so that we're clear about it, Even though an application and a patent have been conceived by different inventive entities, if they share one or more persons as joint inventors, the 102e exclusion for a patent granted to another is not necessarily satisfied. Similarly, in Allergan, after that, this Court considered a patent that was co-invented by two scientists, Dr. Vandenberg and Dr. Woodward, and in deciding whether the earlier references were by another or not, the Court only asked whether they were the work of Dr. Vandenberg and hers alone. The Court never considered, nor did it matter, whether Dr. Woodward had contributed to it. And here our evidence is much stronger than it was in either of those two cases. It's clear that at least one of the Merck inventors conceived of the relevant disclosure in Bodor, and it was legal error to require us to provide evidence of a specific contribution by one of the inventors, Dr. DeLuca. I'll say, though, that even if we did have a burden of production as to that, and that's the only burden we could have had as the patent owner, is a burden of production, we certainly satisfied that as well. In fact, we provided far more evidence than Dr. Katz did in the In Re Katz case. And in Katz, this Court said that his declaration was enough not just to meet a burden of production but to win the entire case. Here we have Dr. Monafo saying very clearly in his declaration that Dr. DeLuca contributed to our development of a proposed dosing regimen and that the four inventors, including Dr. DeLuca, designed the specific regimen as disclosed in Bodor. And remember, as this Court said in Google versus IPA very recently, an acknowledgment of Dr. DeLuca's technical contributions doesn't need to be highly specific. In Google, all that the statement was was that the co-inventor assisted with technical problems at the application level. And here Dr. Monafo— Just give us the record support for what contribution Dr. DeLuca made to the disclosures in Bodor. So the difficulty, Judge Cunningham, is that we were not required to show a particular form of direct evidence of specific contributions by any inventor. This is a rule of reason case. And so all we needed to show at the burden of production level was enough evidence that would support as credible Dr. Monafo's overall account of the situation. This Court said that in NFC and Fleming v. S. Court and cases like that. And so if you compare it to what was done in Google versus IPA, for instance, not only was there Dr. Monafo's declaration, which explicitly states in paragraphs 21 and 34 that Dr. DeLuca contributed to the dosing regimen. You also have his testimony being corroborated by the Amsterdam Minutes and the briefing document from December 2003. You also have the fact that before Amsterdam, Dr. Bodor filed two provisionals that didn't include the dosing regimen at all. The dosing regimen only came into the Bodor— So is it fair to say, then, that you can't separately identify to me what Dr. DeLuca's contribution would have been? I mean, on this record, I can't, because we didn't think we had to, and we don't think, under the law, that we have to. The rule of reason—I mean, this Court said in NFC there's no particular formula that an inventor must follow. We don't need a high degree of corroboration. We certainly don't need specific evidence of each inventor's contribution. This isn't a correction of inventorship case under Section 256, right? And when you look at the Patent Office's practice and the MPEP and the other cases that we identify, none of them have situations that break out by inventor the specific contributions. It's sufficient to just say, particularly when we're just talking about a burden of production, here is evidence that, if believed, will show that each of these people contributed to the disclosure. Now, if they had evidence on the other side, maybe they could carry their burden of persuasion. But I'll note, neither appellee—not Hopewell in this case and not TWI in the next case—put in any evidence on the other side suggesting that anybody else contributed to this disclosure, and certainly not that Dr. DeLuca didn't contribute to it. So you have all the evidence on this is on our side, nothing whatsoever on the other side. And when you're talking about a burden of production, which is all that we had as patent owner, we certainly met that, and the Board erred in finding otherwise. Now, if you disagree with me on that, at the very least, we were entitled to notice that the Board was going to adopt a rule different from what the agency had previously said was the rule in the MPEP, so that we could develop a record that Judge Cunningham might answer the specific question that you just asked me. This record doesn't answer it because we didn't think we had to. There's one other point on this that needs to be addressed, and that's the Board's alternative finding under the Duncan Parking case that Drs. Bodor and Dandeker supposedly actually did themselves contribute to the dosing regimen, even though they denied under oath that they didn't do that. There were two legal errors in the Board's analysis. One is at the first step of the Duncan Parking case, the Board should have confined its inquiry to the portions of Bodor that were relied on as prior art to read onto Merck's claim limitations. The Board incorrectly expanded its view to look at material that Hopewell had cited as evidence of motivation to combine and reasonable expectation of success. Nobody has cited any case suggesting that that's proper, and it would produce absurd results because you'd have a situation where the same reference might be prior art to the same patent claim in an obviousness case, but not in an anticipation case because, of course, motivation to combine and reasonable expectation of success are irrelevant when it comes to anticipation. That's relevant here, actually, because TWI, the appellee in the next case, is raising an anticipation challenge. And so you could have a situation where in analyzing, in doing the Duncan Parking analysis, you'd be looking at a different corpus of material for one challenge versus another, and you'd wind up with a situation where the same reference was and was not prior art, depending on whether you were talking about 102 or 103. That would be absurd. I know of no case that allows that. It would certainly be a terrible idea. At the second stage of – step of Duncan Parking, Hopewell failed to show that the idea of a 10-milligram dose of cladribine was conceived by either Dr. Bodor or Dr. Dandeker. The most that they pointed to was evidence that they made the tablet after the Serono team told them to do it. And in fact, the most that Hopewell and, for that matter, TWI can argue is that the record is silent. We don't know who came up with the idea for a 10-milligram dose. Well, if the record is silent, that means they can't carry their burden of persuasion. A record in equipoise supports us as the patent owner. It is fatal to their position. But we think there's plenty of evidence that it was Dr. Monafo and his colleagues at Serono who conceived of the 10-milligram dose. The Amsterdam minutes show that the IVAC scientists were working on three milligrams until they were told by Serono, start working on 10 milligrams, and then they continued with that. Going back to the by another issue, as I understand it, the board felt that there was just insufficient evidence to show Dr. DeLuca's contribution to the disclosure in the Bodo reference, and that that meant that that disclosure was by a different inventive entity. What's wrong with that? So there are two things wrong with that, Your Honor. The first is that that's not the test, as in the cases that I exerted in responding to Judge Cunningham's question. As long as one or more joint inventors contributed or conceived of the relevant Bodo disclosure, that's enough, and that's what we proved by showing that Dr. Monafo and also Dr. ETA and Dr. Lopez-Bresnahan contributed to that. We weren't required to show anything specific as to Dr. Bodo. But even if you disagree with me on that, the alternative is we did put in enough evidence for a burden of production. Judge Lin, you're absolutely right as to what the board purported to find, which is we didn't show what Dr. DeLuca contributed. We were not required to show anything. All we were required to do as a burden of production was to put forward enough evidence that if taken as true, would support Dr. Monafo's statement, which he makes unequivocally in paragraph 34 of his declaration on page 7586 of the appendix, that he and Dr. Lopez-Bresnahan, with the support of Drs. ETA and DeLuca, designed a regimen for treating MS by administering oral cladribine 10-milligram tablets five to seven days per month, two months, followed by the 10-month cladribine-free period. That's the Bodo disclosure. If you believe that, we have met whatever burden of production we could possibly have had. In fact, if you believe it, then they failed to carry their burden of persuasion. The problem is that the board required us to prove our case at a time when all we had to do was provide a burden of production under a rule that we thought, the NPEP rule, suggested we didn't need to prove what Dr. or we didn't even need to put in evidence as to what Dr. DeLuca had done. With respect to non-obviousness, if I may, obviously, if the court reverses because Bodo is in prior art, you don't need to think about obviousness because all of the invalidity grounds here depend on Bodo being prior art. In the alternative, though, there are legal errors in the obviousness analysis. And the primary one is, the most the board could say is that it would have been logical or within the artisan's skill or there were reasons to consider using Bodo's disclosure as a starting point for the maintenance dose. Remember, the claimed regimen here, it's an unusual dosing regimen. And it's not just saying, you know, take a pill that used to be taken once a week, cut it in half and take it twice a week. This is very unusual. It says, take the pill five times in the first week, then pause until the next month. Take it five times in the second week, then take nothing for eight to ten months, and then start again and do the same and do the regimen again using the same dosing interval. Nobody was doing that, and there was no motivation that could have been found to do that under a proper analysis because nothing in the prior art gave you a reason to retreat with cladribine at the claimed dose using the same frequency. There were an infinite number of possibilities you could have chosen for a maintenance period after the cladribine-free period. The studies that did do retreatment, and there aren't many of them, but the ones that are in the record, did so either at a much lower dose, like Stelmassiac, or much later, at least 12 months later, up to 22 months later in Rice, or only if there was disease progression such that the patient was getting worse and he needed to do something, like Rice and Romine. And the board recognized the reason that the art was so cautious about retreatment with cladribine was because of safety concerns with its use. It was known to have toxicity problems. The board ignored all these cautions, ignored all these concerns, and simply said, citing no evidence, that retreating at the claimed dose and the claimed interval, that's how it would happen. That was throwing darts at a dartboard with the benefit of hindsight only. And it's similar with respect to reasonable expectation of success. All the board said, this is page 63 of the appendix, was that a skilled artisan would have optimized the duration and dosing of the maintenance period as appropriate. This reminds me of nothing so much as the court's decision in In Re Cyclobenzaprine, where it may have been obvious to experiment with this, modifying parameters as appropriate, but nothing indicates a reasonable expectation that an experiment like this would succeed. There were so many options that could have been chosen and widespread skepticism in the field about it. I would say one, I see I'm into the rebuttal time, so I don't want to overstay my welcome. I'll just say one thing about claim construction, if I may. The claims are recognized and the board initially recognized in the TWI IPRs that the total dosage is based on the weight of the patient. It's expressed in milligrams per kilogram. Everybody in the field knows that's dosing based on the weight of the patient. The specification makes clear that the dose is selected based on patient weight. They have no response to the intrinsic evidence. The board wrongly thought we were trying to import a limitation. Of course, we're not trying to do that. Just because a claimed invention typically takes place in a particular environment doesn't mean you're trying to add limitations. It's Rambis versus Infineon. So we would suggest that at the very least, the court should remand for reconsideration under the correct claim construction. But we believe the easiest way through this case, and both these cases, frankly, is to reverse and say that Baudot is not prior art. With the court's permission, I deserve the balance of my time. Thank you, Mr. Formey. Mr. Siegert? May it please the court, J.C. Rosendahl on behalf of Hopewell. Oh, sorry. I'm on the wrong case. I think we're now moved on. Thank you, Mr. Rosendahl. Merck's appeal is built on a proposed legal rule about the meaning of by another that defies almost 60 years of precedent from this court and its predecessor. But the court doesn't even need to address that rule in order to affirm the board's finding of obviousness here, because Merck's proposed new legal rule only deals with half of its problem. Merck's new legal rule is designed to address the problem that Dr. DeLuca, who was Merck's chief IP counsel, has made no discernible contribution to the relevant portions of the Baudot reference. But even under Merck's new rule, they would still have to deal with the board's findings that Drs. Baudot and Dandeker did contribute to the relevant portions of the reference, of which they were, of course, the named authors. And there's ample evidence in the record to support those findings. And if they specifically disclaim any involvement in the part of the reference that is at issue? No, what they said was, they did say that they were not inventors of the dosing regimen. They also said in their depositions, however, that they were not lawyers. They didn't understand what the meaning of inventorship is as a legal matter. And we have testimony from Dr. Munafo, who is a named inventor on the challenge claims, who said that the specific dosage form from Baudot and Dandeker was something that was considered in the development of the regimen, which, of course, makes sense, because how are you going to figure out how to dose something if you don't know what it is that you're dosing? And so when we look at the famous six-line passage that's in dispute here, right in the middle of the passage is it's envisioned that for the treatment of multiple sclerosis, 10 milligrams of cladribine in the instant complex cladribine cyclodextrin complex in the instant solid dosage form will be administered. And it goes on. And as the board correctly observed, if you take out the part about the 10 milligrams of cladribine in the instant dosage form, you have six lines that don't make any sense. So to say that they didn't contribute to the part of the reference that we're relying on just doesn't make sense. So let's assume I don't buy that argument. But I do agree with you on the board's application of the law as to inventorship that it requires all four to be shown as inventors in that portion of Baudot. What about their argument that there's plenty of tests, or maybe not plenty, is it? Plenty is the wrong word. That there's evidence that was put forth by them that's sufficient to establish by the rule of reason that Dr. DeLuca was part of that portion of Baudot. The rule of reason... This is a substantial evidence question, I think, isn't it? Well, no, Your Honor. Actually, it's... Really? You think it... Well, I thought that was helpful to you. Well, hang on. I just want to be clear about what the standard is. The question of who contributed to the relevant portion of Baudot, this Court has treated as analogous to the question of inventorship as a question of law based on underlying facts. And, of course, the underlying facts are, of course, then... I think Mr. Fleming argued that even if the board got the law right, that the board got the fact wrong because Mr. DeLuca did, based upon some of the evidence put forth, contribute to Baudot. Is the board's decision on that, which I think they said he didn't, supported by substantial evidence? Yes. And what is that evidence? Yeah. The board's decision on that is supported by ample substantial evidence. But let me just... Well, the only evidence that they have to support the idea that DeLuca contributed anything is a conclusory statement from Munafo, one of the inventors, that essentially DeLuca was on the team. All right. Now, this Court has required corroboration of conclusory statements of inventorship. And in this case, we don't have any corroboration. In fact, when he was deposed, Dr. Munafo, who is the source of the, you know, the supposed contribution by DeLuca, said that... Do you have the page so we can follow up? Well, what he said, Dr. Munafo, at Appendix 40, sorry, apologies, he said at 4884-85 at his deposition, he said he was not able to say, he said DeLuca, I'm on page 4884, DeLuca was working in a company, Serrano, for long, but in a department remote to mine. I'm not able to say in detail what his contribution was. And then there were some objections. And then on page 4885, he said, as I said, his department was remote to mine. I'm not aware of his, how you call it, personal intellectual contribution. I cannot give details on that besides the fact that his department was also represented in the project team. So what we know is that Dr. DeLuca's team somehow was involved in the project. And we know that it was a big team because Dr. Munafo, at Appendix 75-79, said my team at Serrano included my co-inventors and many others. So the mere fact that people were on the team doesn't tell us that they were contributing in any meaningful way to Bodor. And then when we ask, well, what shows that DeLuca contributed anything to Bodor, they point to two potentially corroborating documents. One of them is draft minutes from a meeting that Dr. DeLuca did not attend. And the only thing that the meeting minutes have to say about him to the, there's a mention of a DeLuca. It's not clear that it's the same DeLuca. And what it says is that someone is supposed to facilitate contact with this DeLuca, which suggests that he's not been involved in any way up to that point. And then we have another briefing document about Cladramine that doesn't mention him at all. So, that's it. No, you know, Bodor and Dandeker said they didn't know anything about DeLuca. There's no evidence of any contribution by him other than that his department was somehow represented on the large project team that admittedly involved a lot of people other than the named inventors. So can we, can I take you back to the legal standard now because Mr. Fleming cited a couple cases that he said from us that supports the view that only one inventor has to have overlap between the two references for it to be not by another. What's your best case law to support your position? Well, you know, the granddaddy of all cases is In re Land from this court's predecessor in the 1960s. And if the rule were as Merck is suggesting, then In re Land could not have come out the way that it came out, right? That was a case where Land and Rogers were named inventors on the challenged patent. There was a prior art patent to Land, there was a prior art patent to Rogers, and it was found that both of those were by another with respect to the Land and Rogers invention. So the proposition that it's enough to have just one co-inventor and you get home free is not the law, and it never has been. This court stated in Riverwood in 2003 and again quoted the same passage in Americam in 2017, what is significant is not merely the differences in the listed inventors, but whether the portions of the reference relied on as prior art and the subject matter of the claims in question represent the work of a common inventive entity. And it's clear that common inventive entity means the exact same set of inventors. So it's black letter law that you have to have the same people. I'm happy to... We have a statement in Applied Materials that even though an application and a patent have been conceived by different inventive entities, if they share one or more persons as joint inventors, the 102E exclusion for a patent granted to another is not necessarily satisfied. Now that's 102E, and you're talking about one inventor. Right. But what that means is that if you look at the prior art and they have the same inventive entity or one common inventor, the question still remains... Let me back up. The first thing that you need to do in the analysis is see whether they have the same inventive entity or not. And if it turns out that they do, usually the analysis is done. If it turns out that the prior art reference has a different inventive entity, then the question becomes who is responsible for the disclosure of the particular portions that are being relied on for the invalidity challenge, right? That's the lesson of this Court's cases. Mr. Fleming suggests that it would be satisfied if there was at least one in the prior document. No, but the point is this is the sort of the sleight of hand that appears repeatedly in Merck's arguments on this point. What the Court says is first you look to see if the inventive entities are the same. If they're not the same, that doesn't mean that the inquiry is over. What it means is that you then need to go and figure out for the particular disclosures that are at issue whether the inventive entities are the same. And this is what LANS stands for. And this is what LANS stands for. And it's also in the two cases that... So hypothetically in this case, if, and I don't think they tried to show this, but if they'd shown that even though Dr. DeLuca was named on the patent, that the three people, other people, were the ones, the only ones that were the inventors of the specific claims or whatever we're talking about here that's repeated in Bodor, that that might be not by another because maybe Dr. DeLuca didn't contribute to that specific part. He contributed to something else. But they didn't attempt to show that Dr. DeLuca didn't contribute. I think their argument is that he did. Your Honor is absolutely right on all of that. They have never suggested that DeLuca did not contribute to all of the claims that are of interest. And the point that Your Honor has just made, I think, is illustrated in footnote two of this Court's decision in Duncan Parking. What we saw there was a situation where there was a patent to King, Hunter, Hall, and Jones. And the prior art was by King and Schwartz. And what the Court found, or what the Board found and the Court accepted, was that some of the claims were actually the work of King alone. And in order to make the prior art, the relevant question for those claims was, did King contribute alone to the prior art disclosure? And for the other claims, which were admittedly by King, Hunter, Hall, and Jones, the question was, did the portion of the prior art that was relevant, was that the work of King, Hunter, Hall, and Jones? And so you're always looking piece by piece at who contributed to which claims and who contributed to the parts that are being used to render invalid those claims. What I also thought I heard a post-counsel arguing, though, was which one of you needs to actually give that information in terms of who contributed? I sensed that, and maybe he'll be able to clarify it on rebuttal, that he would say, you should be the party in charge of that as opposed to him. And I want you to respond directly to that. Sure. Under the burden-shifting framework that this Court set out in Google, obviously, the burden is on us, at the end of the day, to prove invalidity. The burden is also on us to come up with a prima facie case that the prior art is by another. We satisfied that burden easily here because Boter and Dandeker are named on the prior art. They're not named on the challenge claims. Then the question, then the burden shifts to them. And the burden is to go forward with evidence that, if credited, would be sufficient to show that they, that the relevant inventive entity is responsible for the relevant portions of the document. And what they need to show is told to us by Duncan Parkin. They need to show that the other person's contribution is significant enough to render him a joint inventor of the applied portions of the reference patent. And that's what's missing here. And it's, it's, in the Google case itself, I was surprised to hear my friend invoke that as, as an example of the rule of reason. Because in that case the missing, the, the, the would-be additional inventor, Dr. Moran, was, was an author on the main prior art reference. He also put in a declaration explaining his contributions to the claimed invention. And then the other inventors admitted that he had made a contribution both to the reference and to the, the invention. And what, and what, what Mark is trying to read that case for is like, oh, well, all the inventors have to say is, well, they made some contribution. That would be true if Dr. DeLuca were an author of Bodor. And if he had put in a declaration explaining in detail his contribution to Bodor, this would be a very different case. But to suggest that a conclusory declaration by an inventor that somebody's department was represented on a team is enough to satisfy the Duncan Parkin standard, I think is not something that the court should accept. I have only a little bit of time left. I'm happy to very quickly address the question of obviousness and, and claim construction on obviousness. You know, this is essentially a battle of the experts, and the, the board credited our experts' testimony that there would have been ample reasons for people to consider retreating. I think the fundamental issue here is the, that multiple sclerosis is a chronic disease. And so, and, and cladrobine is known from the prior art to have only temporary effects. And so, we see in the prior art that people who were treated with cladrobine do well for a while, and then they tend to relapse. And that there's ample testimony that one would retreat people in order to, not only to treat the relapses, but to reduce the rate of relapse and to prevent future relapses. And the way that the dose would be optimized would be by measuring lymphocyte counts, which everyone agrees is a standard measure that is taken in, in multiple sclerosis patients. And at the risk of oversimplifying somewhat, you'd like to give as much of this stuff as you can to people without degrading their immune systems to the point where they have problems with their immune system. I see that I'm out of time. If the court has any questions about claim construction, I'm happy to address them. Thank you. Mr. Philbing, you've got about a minute, but I'll give you a little leeway on the inventorship issues if you promise not to completely repeat your arguments again in the next case. The last thing I want to do is, no, I do not plan to repeat anything. And if I do, you can, you can call me on it as, as I know you will. I'd like to start, Judge Hughes, if I may, with, with the hypothetical that you asked my colleague, which is, and, and, and try to answer it this way. The whole reason we didn't try to show that Dr. DeLuca, you know, contributed to the patent claims as opposed to the disclosure is, it doesn't really matter. I mean, assume you're right. Assume that your hypothetical is correct, that the three co-inventors contributed to what's in the Bodor disclosure, and then Dr. DeLuca contributed to what else was in the, the patent claims. What would be the point of withholding a patent in that circumstance? You'd just be punishing the three co-inventors for collaborating with Dr. DeLuca on what was later claimed and what they invented, and what Dr. Bodor and Dandeker have expressly said, we did not invent, we didn't claim. This is a dosing regimen. The Serrano team was working on that. So there's no policy reason for the, the approach that's being put forward here. Judge Lin, in Ray Land, I mean, the holding, the, the, the core reasoning of that case is you look at the facts, you look at the evidence. Land was a highly idiosyncratic case. It was Mr. Land's and Mr. Rogers' own prior patent that was being asserted against their effort to extend their monopoly by coming in jointly. Frankly, I think it, it would be very good for this Court to clear up the law in this area because there have been a number of different articulations of the right standard. At the very least, we think the language that I quoted and then Judge Lin that you repeated from applied materials suggested that our reading of it was reasonable and the MPEP's reasoning, or reading of it was reasonable. If we were wrong about it, the APA allowed us the right to have notice of it so we could develop the record that my colleague now suggests that we should have. I would certainly give you the, the argument that this is, this is not as clear as it could be. I, I, that's an understatement, Judge Lin. I completely agree with that. With respect to the, the Bodor Declaration, so what we've been calling the Duncan Parking issue, which is, of course, a separate issue, towards the end of his argument, Mr. Rosenau was suggesting that Duncan Parking was somehow relevant to whether Dr. DeLuca contributed to the disclosure. That's, that's two different issues. The Duncan Parking question is whether Dr. Bodor or Dr. Dandeker contributed to the dosing regimen even though they said under oath that they didn't. I'll point out he mentioned the cyclodextrin complex that Drs. Bodor and Dandeker did try to patent. That's not claimed in our patent. That's the whole point. This is like in Ray Matthews, right? Mr. Matthews invents a circuit. Mr. Dewey invents a protective device. He discloses a protective device and says this works very well with the Matthews circuit. That's not prior art to Matthews because he's just disclosing what Dr. Matthews came up with. When, if, when they invent a cyclodextrin complex and they disclose that, but then they say this will work well in this dosing method, that's not prior art to the inventors who came up with the dosing method. This wasn't a battle of the experts because there simply was, and, and it's very notable, Mr. Rosenau was very careful. He said that the art showed that you would retreat with cladriby. Now I'm willing to spot him in that arguendo. Let's assume he's right about that, that the prior art indicated you should retreat with cladriby. Nothing suggested that you should retreat at this particular dose using this particular interval over this particular period of time. All of the references approached it in a different way, either for, with a smaller dose or waiting longer because of the toxicity effects or doing it only when the patient got worse and needed something. This lymphocyte level argument, the idea that you could optimize by looking at the patient's lymphocyte levels, the board and their own expert, Dr. Miller, admitted lymphocyte levels don't tell you anything about whether the disease is being treated. It doesn't correlate to efficacy. So saying that there's a connection between how much cladribine you take and your lymphocyte levels does not tell you whether the disease is being treated. And remember, this is an issue of motivation to combine. Why would a skilled artisan say, I'm going to retreat at this particular level and watch the lymphocyte levels if that's not going to tell me whether my patient is going to get better or not? This is just, once again, throwing darts at a dartboard. It's in recyclobenzaprine. The board erred in law as a legal matter in reaching this conclusion. We didn't hear anything about claim construction. I may have an opportunity in the next case to address that further if needed. Unless the court has questions at this time, you'll be seeing me again very shortly. Thank you. Thank you, Your Honor. Thank you to both counsel. The case is submitted.